UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | |
|---|---|
| LOUIS RUBINSTEIN, on behalf of himself, and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WINN-DIXIE STORES, INC.,<br>FRANK LAZARAN, ALLEN R. ROWLAND,<br>RICHARD P. McCOOK,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

3:04-CV-71-J-99 MCR

## CLASS ACTION COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff, based upon the investigation of counsel, which included analysis of publicly-available news articles and reports, conference calls, public filings, press releases and other matters of public record, and consultation with a forensic accountant.

## NATURE OF THE ACTION

1.     This is a class action on behalf of all purchasers of the common stock of Winn-Dixie Stores, Inc. ("Winn-Dixie" or the "Company") between October 9, 2002 and January 29, 2004, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Throughout the Class Period, defendants portrayed Winn-Dixie, a public company whose chief asset is its large supermarket chain serving Florida, Alabama, Georgia, and several other southeastern states, as a growing and competitive company. In fact, just the opposite was true.

3.     Throughout the Class Period, Winn-Dixie was suffering from substantial undisclosed long-term business and financial problems. The Company was unable to market its Winn-Dixie brand competitively, it was unable to reduce excess expenses when needed, it recorded the carrying value of its long-lived assets at inflated levels, and maintained insufficient reserves for self-insurance. In addition, Winn-Dixie had no credible or workable marketing plan in place which would allow it to compete effectively with other large supermarket chains and discounters, such as Publix and Costco.

4.     Nevertheless, throughout the Class Period, defendant Allen Rowland ("Rowland") and later defendant Frank Lazaran ("Lazaran"), Rowland's successor as CEO, continued to tell investors that Winn-Dixie was following through on its strategic marketing plan. As evidence of its success and financial health, Winn-Dixie declared cash dividends throughout the Class Period.

5.     Approximately mid-way through the Class Period, in June 2003, Rowland stepped down as CEO and received $7.7 million as a severance, supposedly for improving store operations and enhancing the Company's financial condition. When Lazaran replaced him, unbeknownst to the investing public, Lazaran ordered his senior management to conduct a "comprehensive review" of Winn-Dixie's "entire business model." Even while this plan to restructure the Company's business model was underway, Winn-Dixie and Lazaran continued to tell the public that the Company was successfully executing its sales and marketing plan, with declared dividends to prove it. The Company's stock price rose throughout the Class Period on this encouraging news.

6.     On January 30, 2004, before the opening of trading, Winn-Dixie and Lazaran lowered the boom. In a press release that day, Lazaran stunned the public with disastrous financial results for the Company's second fiscal quarter ended January 7, 2004. The Company's sales were down

-2-

over a quarter of a billion dollars from the prior year period. The Company had sustained a loss of $79.5 million, or $0.57 per share. Employing understatement, Lazaran told the public: "[W]e recognize that we cannot continue down this path."

7.      The Company also announced that it would take a "series of major actions" to change the way the Company does business, including, brand positioning for its Winn-Dixie brand, $100 million in expense reduction by July 1, 2004, in-depth analysis of the Company's core markets, market share, and competitive positioning, an "image makeover program," and an initiative to "reengineer" organizational effectiveness and accountability. In addition, the Company announced that it would recognize a $36.4 million charge to earnings for impairment to its long-lived assets, namely, its store locations, and would add $21.4 million to its reserves for self-insurance expense, which included additional reserves for workers' compensation claims. The Company also discontinued payment of dividends indefinitely.

8.      The market reacted swiftly to the news. Winn-Dixie's stock plunged on January 30, 2004 from $9.09 to $6.56 per share on volume of 24.6 million shares.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1337 and 1367 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or

its effects have occurred within this District.  In addition, defendant Winn-Dixie is headquartered in Jacksonville, Florida, within this District.

12.     In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff purchased Winn-Dixie common stock during the Class Period, as set forth in the accompanying certification which is incorporated herein by reference, and was damaged thereby.

14.     Defendant Winn-Dixie is a major food and drug retailer operating in 12 states in the southeastern United States and the Bahama Islands.

15.     The individual defendants, at all times relevant to this action, served in the capacities listed below and received substantial compensation:

| Name | Position |
|------|----------|
| Lazaran | President, CEO and Director from June 26, 2003 to present; prior to June 25, 2003, Lazaran was Winn-Dixie's COO and Executive Vice-President at all material times. |
| Rowland | CEO, President, and a Director at all relevant times to June 26, 2003. |
| McCook | CFO and Sr. Vice President at all material times. |

16.     The Individual Defendants, as senior officers and/or directors of Winn-Dixie were controlling persons of the Company. Each exercised their power and influence to cause Winn-Dixie to engage in the fraudulent practices complained of herein.

17.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Winn-Dixie common stock, by disseminating materially false and misleading statements and/or concealing material adverse facts. As part of the scheme: (i) defendants deceived the investing public regarding Winn-Dixie's business, its finances and the intrinsic value of Winn-Dixie's common stock; and (ii) caused plaintiffs and other members of the Class to purchase Winn-Dixie common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired Winn-Dixie common stock between October 9, 2002 and January 29, 2004, inclusive and who were damaged thereby. Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Winn-Dixie and the directors, officers and employees of Winn-Dixie or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

19.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are thousands of members of the Class located throughout the United States. As of June 25, 2003, there were

reportedly more than 140 million shares of Winn-Dixie common stock outstanding, and 43,345 shareholders of record. Throughout the Class Period, Winn-Dixie common stock was actively traded on the New York Stock Exchange (an open and efficient market) under the symbol "WIN." Record owners and other members of the Class may be identified from records maintained by Winn-Dixie and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

20.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.     whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.     whether defendants participated in and pursued the common course of conduct complained of herein;

c.     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Winn-Dixie;

-6-

d.      whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Winn-Dixie;

e.      whether the market price of Winn-Dixie common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.      the extent to which the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

24.     The Class Period begins on October 9, 2002.  On that date, the Company issued a press release reporting financial results for the 12 weeks ended September 18, 2002.  According to the Company, sales were $2.8 billion, an increase of $25.0 million or 0.9% compared with the prior year quarter.  Net earnings were $34.8 million, or $0.25 per diluted share compared to $22.4 million, or $0.16 per diluted share, an increase of 55.3%.  According to the press release, improved earnings were achieved "despite costs related to the 'Customer Reward Card' rollout in the Montgomery and New Orleans divisions."

25.     Speaking about the quarter's results, CEO and President, defendant Rowland stated:

-7-

Our increase in identical store sales, in the face of a weak economy, is evidence that we are improving operations and that our marketing efforts are in tune with our customers' needs. This is particularly rewarding when many of our competitors' results are negative. We are committed to a strategic plan that provides for sustainable, profitable growth.

26. The Company's stock price rose on the announcement from $12.34 to $13.30. The foregoing statements, however, were false and misleading because, as Rowland then knew, Winn-Dixie had no sustainable strategic plan to provide "profitable growth." Rowland's comments led the investing public to believe that Winn-Dixie's marketing efforts were leading to profits, when in fact, Winn-Dixie's market share was eroding, the Company had little control over expenses, and was unable to market its Winn-Dixie brands competitively. In addition, for the quarter ended September 18, 2002 the Company decreased its reserve for self-insurance and continued to decrease the reserve during the Class Period, although, as defendants knew, the self-insurance reserve should have been increased because of the Company's experience with regard to losses and claims.

27. On October 9, 2002, the Company filed its Form 10-Q for the quarterly period ended September 18, 2002. The Form 10-Q was signed by Rowland and McCook. The financial statements included within the Form 10-Q materially understated the reserve for self-insurance and thereby materially overstated reported net earnings. In addition, the financial statements materially understated the Company's charge for impairment of long-lived assets and thereby materially overstated reported earnings. The Form 10-Q was also false and misleading because it did not disclose in the Management's Discussion and Analysis ("MD&A") section the marketing and competitive problems the Company was then experiencing, as set forth in ¶26.

28. On October 21, 2002, Winn-Dixie's board of directors declared a cash dividend of 5 cents per share on common shares for the quarter ended September 18, 2002. Defendant Rowland

stated: "Our financial position continues to strengthen as a result of strong cash flow and our operations are improving each and every day. The declaration of a dividend by the Board shows confidence that the Company is meeting its planned results."

29.     The foregoing statements were false and misleading because there was no basis for Rowland's statement that the declaration of the dividend was evidence that the Company was meeting its planned results, as discussed below. In fact, as will be explained more fully, the Company had to quickly cut its declared dividend because it was unable to sustain positive cash flow. The Company's reliance upon a dividend grant as evidence of its financial soundness was false and misleading because Rowland knew, or recklessly disregarded, that the dividend was unsustainable.

30.     On November 14, 2002, the Company announced that Canadian Imperial Bank of Commerce announced on that day that it would no longer maintain automated teller machines ("ATMs") in Winn-Dixie stores. The Company knew or recklessly disregarded that termination of in-store ATM services would result in a decline in sales in stores that previously featured cash machines, and that accordingly there would be an impairment of the value of those store locations.

31.     On January 29, 2003, Winn-Dixie issued a press release for its second fiscal quarter, which ended January 8, 2003. Sales were $3.8 billion, an increase of $18.2 million, or 0.5% compared with the same quarter in the prior year. Net earnings from continuing operations for the 16 weeks ended January 8, 2003 amounted to $91.4 million, or $0.65 per diluted share as compared to $52.0 million or 37 cents per diluted share, for the corresponding quarter of the previous year.

32.     According to then CEO Rowland:

We are pleased to have achieved positive identical store sales of 1.3% at a time when many of our competitors are reporting negative identical store sales. Identical store sales growth and increased profitability must be balanced in these times of challenging economic conditions and aggressive pricing by competitors. *We continue to focus on consistent execution of the basics of supermarket operations, while investing in effective marketing programs and experimenting with new departments and formats.* The early results from these new initiatives are encouraging. Also, we prepaid the $143 million remaining balance of our six-year term loan earlier today.

33.     The foregoing statements were false and misleading for the reasons set forth above

in paragraphs 26-27 and 29 above.

34.     On January 29, 2003, the Company filed its quarterly report for the period ended

January 8, 2003 on Form 10-Q (its second fiscal quarter of 2003), signed by Rowland and McCook.

The financial statements included within the Form 10-Q materially understated the reserve for self-

insurance and thereby materially overstated reported net earnings. The financial statements also

materially understated the Company's charge for impairment of long-lived assets and thereby

materially overstated reported earnings. In addition, there was no disclosure in the MD&A section

of the business and marketing problems set forth in ¶26.

35.     On April 21, 2003, Winn-Dixie issued a press release again announcing that its Board

had declared a cash dividend of 5 cents per share for the quarter ended April 2, 2003. According to

Rowland: "*We continue to make progress in improving retail operations. The declaration of the*

*dividend by the Board shows confidence that the Company is making progress towards its*

*financial goals.*"

36.     Rowland's statements were false and misleading because they ignored several

financial problems that persisted at Winn-Dixie, including the need to reassess the value of the

Company's long-lived assets and to increase reserves for self-insurance. Moreover, the Company's

financial results -- obtained largely by ignoring charges to earnings that should have been made --

also ignored Winn-Dixie's fundamental problem of being unable to compete long-term against

Costco and Publix Supermarkets and other large food chains.

37.     On April 23, 2003, the Company announced its financial results for its third quarter

of fiscal 2003, namely, the 12 weeks ended April 2, 2003, as follows:

> Sales from continuing operations for the 12 weeks ended April 2, 2003 were $2.8
> billion, a decrease of $79.3 million, or 2.7%, compared with the same quarter last
> year. For the 40 weeks ended April 2, 2003, sales from continuing operations were
> $9.4 billion, a decrease of $36.1 million, or 0.4%, compared with the prior year.
> Identical store sales, which include enlargements and exclude the sales from stores
> that opened or closed during the period, decreased 2.0% for the quarter and increased
> 0.5% for the year.  Comparable store sales, which include replacement stores,
> decreased 2.0% for the quarter and increased 0.5% for the year.  Prior year sales
> included sales from the Easter holiday, which was in the third quarter of fiscal 2002
> compared to the fourth quarter of fiscal 2003.  The Easter holiday represented a
> decrease in sales for the quarter as compared to the prior year of approximately 1.0%

> Net earnings from continuing operations for the 12 weeks ended April 2, 2003 were
> $50.6 million, or $0.36 per diluted share, as compared to $51.4 million, or $0.36 per
> diluted share, for the corresponding quarter of the previous year.  For the current
> year, net earnings from continuing operations were $176.7 million, or $1.26 per
> diluted share, compared to $134.4 million, or $0.95 per diluted share, in the previous
> fiscal year.  Included in the current year earnings is bank agreement termination
> income of $52.7 million ($34.0 million net of tax, or $0.24 per diluted share).

> Al Rowland, Winn-Dixie's President and Chief Executive Officer stated: '***Given the
> difficult challenges that our economy and industry face, we are encouraged with
> our ability to maintain profitability at 1.8% of sales this quarter.  The timing of
> Easter as well as economic uncertainty and aggressive pricing and promotion by
> our competitors impacted the results of the quarter.  Although we did invest in
> some strategic price reductions in the quarter, we maintained our targeted gross
> margin level through efficiencies in our centralized procurement.  In addition, we
> reduced our labor costs through improved scheduling of our store associates while
> continuing to provide service to our customers.  Our focus will continue to be on
> balancing profitability and top line growth.***'

> For the 40 weeks ended April 2, 2003, Winn-Dixie opened seven new stores,
> averaging 42,800 square feet, closed 10 stores, averaging 31,700 square feet and
> enlarged or remodeled 44 stores.  As of April 2, 2003, there were 1,070 stores in

operating, compared to 1,150 last year. As of April 2, 2003, retail space totaled 47.4 million square feet compared to 51.0 million square feet in the prior year. The Company has eight new stores under construction.

38.    The foregoing statements were false and misleading for the reasons set forth above in paragraphs 26-27 and 29.

39.    On April 23, 2003, the Company also filed its Form 10-Q for the quarterly period ended April 2, 2003, signed and certified by Rowland and McCook. The financial statements included within the Form 10-Q materially understated the reserve for self-insurance and thereby materially overstated reported net earnings. The financial statements also materially understated the Company's charge for impairment of long-lived assets and thereby materially overstated reported earnings. In addition, there was no MD&A disclosure of the problems set forth in ¶26.

40.    On May 2, 2003, A. Dano Davis, Winn-Dixie's Chairman, announced that effective June 26, 2003, defendant Rowland would retire as CEO and that defendant Lazaran would become the new CEO and President and would be appointed to the board of directors. In the press release making this announcement, Davis stated that: *"In his three-and-a-half years Al has improved our store operations and enhanced our financial position."* Rowland was given a termination payment of *$7.7 million* -- an incredible fact, given the poor operating and financial condition that Winn-Dixie was then in, as later revealed by the Company on January 30, 2004.

41.    On June 11, 2003, the Company announced revised earnings guidance for its fourth quarter of fiscal 2003:

> The Company expects its identical store sales to decline by 3-4% for the fourth quarter ending June 25, 2003, adjusted for the Easter timing impact. The Company anticipates reporting earnings per diluted share in the range of $0.28 to $0.31 for the fourth quarter, which excludes the items discussed below. These preliminary earnings results are lower than prior guidance, primarily because of continued

-12-

softness in sales throughout the fourth quarter.    The difficult economic and competitive environment, which began in the third quarter, has continued throughout the past few months.

As announced in early May, Al Rowland, President and Chief Executive Officer, will be retiring prior to the end of the fiscal year.  In accordance with his employment contract, the Company will incur an expense of $7.7 million ($5.0 million, net of tax), which represents a cash payment of approximately $6.1 million with the remainder paid in stock and options of the Company.  In addition, the Company has negotiated a final settlement with the Internal Revenue Service (IRS) related to the company-owned life insurance (COLI) tax liability.  In July 2002, the Company paid $52.0 million to the IRS from a related reserve.  As no additional amounts will be paid, the remaining tax reserve related to COLI will be reversed as a reduction of income tax expense, which is expected to increase net earnings in the amount of $28.0 million.

42.      The foregoing statements were false and misleading for the reasons set forth above in paragraphs 26-27 and 29.

43.      On July 21, 2003, the Winn-Dixie board declared a cash dividend of 5 cents per share for the quarter ended June 25, 2003.  Lazaran stated: "We are pleased to pay our fourth quarter dividend.  The supermarket industry continues to be competitive throughout the southeastern United States.  In spite of this competitive environment, our balance sheet continues to strengthen as we make progress towards our financial goals."

44.      Lazaran's statements above were false and misleading because Lazaran then knew or recklessly disregarded that the Company was in need of a near-complete overhaul.  According to the Company's later disclosure, Lazaran had at this time directed that the Company conduct a "comprehensive review of [its] entire business model."  Far from "making progress towards its financial goals," Lazaran knew that serious steps were needed to change Winn-Dixie's path or it would lose significant earnings in the months ahead.

-13-

45.     On August 7, 2003, Winn-Dixie issued a press release announcing its financial results

for its fourth fiscal quarter, and fiscal year ended June 25, 2003.  According to the press release:

> Net earnings from continuing operations for the quarter were $62.5 million, or $0.44
> per diluted share, compared to $52.8 million, or $0.37 per diluted share, for the same
> quarter last year.  For the year, net earnings from continuing operations were $239.2
> million, or $1.70 per diluted share, as compared to $187.2 million, or $1.33 per
> diluted share, for the previous year.  Net earnings (loss) for the prior year including
> discontinued operations were $(21.9) million, or $(0.16) per diluted share, for the
> quarter and $86.9 million, or $0.62 per diluted share, for the year.
>
> During the current quarter, the company-owned life insurance issues were settled
> with the Internal Revenue Service, which resulted in the reversal of tax reserves
> totaling $28.0 million, or $0.20 per diluted share.  In addition, an expense was
> incurred for the retirement payments to the former CEO under his employment
> agreement that totaled $5.0 million after tax, or $0.04 per diluted share.
>
> Sales from continuing operations for the 12 weeks ended June 25, 2003 were $2.7
> billion, a decrease of $130.0 million of 4.5% compared with the same quarter last
> year.  For the 52 weeks ended June 25, 2003, sales from continuing operations were
> $12.2 billion, a decrease of $166.0 million or 1.3% compared with the prior year.
> Identical and comparable store sales decreased 4.5% for the quarter and 0.7% for the
> year.  The Easter holiday fell in the fourth quarter of fiscal 2003 and the third quarter
> of fiscal 2002.  Adjusted for the estimated impact of the timing of the Easter holiday,
> identical and comparable sales for the fourth quarter would have decreased 5.5%.
> Identical stores include enlargements and exclude the sales from stores that opened
> or closed during the fiscal year.  Comparable stores include replacement stores.
>
> Frank Lazaran, Winn-Dixie's President and Chief Executive Officer stated, 'During
> the fourth quarter we experienced an increase in competitive activity that negatively
> impacted our identical store sales.  Many of our competitors lowered their earnings
> estimates over the past few months in order to significantly increase their
> promotional activity.  In addition, military troop deployments and general economic
> conditions contributed to weaker sales in the fourth quarter.  We have adjusted our
> earnings estimate for fiscal 2004 to reflect a more aggressive pricing and promotional
> stance going forward using our reward card to deliver those savings.  We are also
> making improvements in our shrink and in-stock conditions.

46.     The Company gave the following revised guidance:

[W]e expect the first quarter of fiscal 2004 to be at approximately breakeven. The expected range for fiscal 2004 of $1.00 to $1.10 per share is contingent on the successful implementation of our pricing and promotional plans.

47.     Even the revised guidance, however, was false and misleading for the reasons stated above in paragraphs 26-27 and 29, and because there was no disclosure of the impairments to long-lived assets and the need for additional reserves for self-insurance.

48.     On August 7, 2003, the Company also filed its Form 10-K with the SEC for the fiscal year ended June 25, 2003. The financial statements included within the Form 10-K materially understated the reserve for self-insurance and thereby materially overstated reported net earnings. The financial statements also materially understated the Company's charge for impairment of long-lived assets and thereby materially overstated reported earnings. In addition, there was no MD&A disclosure of the problems in ¶26.

49.     On October 9, 2003, the Company issued a press release for the quarterly period ended September 17, 2003. The press release stated:

Sales for the 12 weeks ended September 17, 2003 were $2.7 billion, a decrease of $164.1 million or 5.8% compared with the same quarter last year. For the quarter, identical store sales, which include enlargements and exclude the stores that opened or closed during the period, decreased 6.6%. Comparable store sales, which include replacement stores, decreased 6.6% for the quarter.

Net earnings for the quarter were $1.2 million, or $0.01 per diluted share, compared to $34.8 million, or $0.25 per diluted share, for the same quarter last year.

Frank Lazaran, Winn-Dixie's President and Chief Executive Officer stated, 'Our previously reported earnings guidance of breakeven reflected our commitment to invest promotional dollars to increase sales. During the quarter, we initiated a plan to increase sales and improve earnings for the remainder of the fiscal year. The plan includes increased promotional activity, lowered pricing, improved friendly service, clean stores, improved in-stock conditions, neighborhood-specific marketing and increased capital expenditures for remodeling, especially expenditures for in-store lighting improvements. We are committed to executing and following through on the

-15-

plan. Our results will depend on our execution, competitors' response and customer acceptance of our plan over the remainder of the year.'

On October 7, 2003, the Company amended and restated its senior secured credit facility. As amended, the facility includes a three-year revolving facility of $300.0 million containing multiple one-year renewal options and replaces the prior 364-day and five-year revolving facilities. The amended facility is an asset-based facility with a borrowing base comprised of an agreed percentage of the inventory balance.

50.     On October 10, 2003, the Company filed its Form 10-Q for the quarterly period ended September 17, 2003, signed by Lazaran and McCook. The financial statements included within the Form 10-Q materially understated the reserve for self-insurance and thereby materially overstated reported net earnings. The financial statements also materially understated the Company's charge for impairment of long-lived assets and thereby materially overstated reported earnings. In addition, there was no MD&A disclosure of the problems set forth in ¶26.

51.     On October 20, 2003, the Winn-Dixie Board again declared a dividend of 5 cents per share for the quarter ended September 17, 2003. In connection with the dividend declaration, Lazaran stated:

'On October 8, 2003, we reported relatively flat earnings of $0.01 per share,' Winn-Dixie President and Chief Executive Officer, Frank Lazaran stated. 'Increased sales and earnings have to come from the execution of our sales and marketing plan, but are dependent on customer acceptance. Dividends are paid out of current results. The Board of Directors will closely monitor the payout ratio throughout the remainder of the fiscal year. The declaration of the dividend by the Board shows confidence in the Company.'

52.     Lazaran's statements in connection with the announced dividend were false and misleading for the reasons set forth above in paragraphs 26-27 and 29.

53.     On January 20, 2004, the Board again announced that it had declared a dividend of 5 cents per share for the quarter ended January 7, 2004. Lazaran stated:

'We are pleased to pay our second quarter dividend,' said Frank Lazaran, Winn-Dixie President and Chief Executive Officer. 'We are aggressively addressing significant operational and marketing issues through the execution of our business plan. Payment of the dividend is an indication of our Board of Directors' support for our long-term strategic plan.'

54.     Lazaran's statements were false and misleading because as Lazaran then knew, the

Company had no "long-term strategic plan." Lazaran was soon to announce that the Company would

need to completely overhaul its marketing and sales approach, as discussed below.

## THE TRUTH IS REVEALED

55.     On January 30, 2004, the Company shocked the market with a press release

announcing financial results for the quarter ended January 7, 2004, the Company's second fiscal

quarter:

Sales for the 16 weeks ended January 7, 2004 were $3.6 billion, a decrease of $225.5 million or 6.0% compared with the same quarter last year. For the 28 weeks ended January 7, 2004, sales were $6.2 billion, a decrease of $389.6 million, or 5.9%, compared with the prior year. Identical store sales, which include enlargements and exclude the stores that opened or closed during the period, decreased 6.8% for the quarter and 6.7% for the year. Comparable store sales, which include replacement stores, decreased 6.8% for the quarter and 6.7% for the year.

Net loss for the 16 weeks ended January 7, 2004 was $79.5 million, or $0.57 per diluted share, compared to net earnings of $91.4 million, or $0.65 per diluted share, for the same quarter last year. For the current year, net loss amounted to $78.3 million or $0.56 per diluted share, compared to net earnings of $126.2 million, or $0.90 per diluted share, in the previous fiscal year.

The Company attributed its second quarter loss to several factors, including the impact of its aggressive pricing programs on gross profit margins and the increasingly competitive environment in the grocery industry. In addition, an asset impairment charge of $36.4 million and an increase in the self-insurance reserve of $21.4 million added to the loss for the quarter.

For the 28 weeks ended January 7, 2004, the Company opened six new stores, averaging 32,600 square feet, closed one store, totaling 33,500 square feet and enlarged or remodeled 131 store locations, for a total of 1,078 locations in operation

at January 7, 2004, compared to 1,075 at January 8, 2003. Of the 131 remodels, 98 were image remodels, which are less in scope than a standard remodel. As of January 7, 2004, retail space totaled 47.8 million square feet compared to 47.6 million square feet in the previous year.

'We are obviously disappointed in this quarter's results and we recognize that we cannot continue down this path,' said Frank Lazaran, Winn-Dixie's President and Chief Executive Officer. *'For the last six months, I have led our senior management team in a comprehensive review of our entire business model. As a result, we are announcing today a series of major actions that will change the way we do business and help us to shape the future of this Company.'*

STRATEGIC PLAN
Lazaran announced the following initiatives immediately being implemented by the Company:

Brand Positioning
● Lazaran announced that the Company has retained VML, an experienced brand marketing consulting firm, to conduct consumer research and review its business strategies and marketing programs. 'The key to retailing is delivering sales and growing market-share,' Lazaran said. 'VML understands that and is helping us to devise strategies to increase sales.' In conjunction with VML, the Company is reviewing customer preference research to establish strategic priorities. Over the next few months, the Company will announce additional steps being taken to establish a clearly differentiated Winn-Dixie brand position based on price, service, convenience and product assortment.

Substantial Expense Reduction
● Lazaran announced a substantial expense reduction plan. 'The impact of expense reduction will begin immediately,' Lazaran said. 'We will achieve a $100.0 million annual expense reduction rate based on current expense levels by July 1, 2004. We understand that we need to be an efficient company to be a competitive company.' Expense reduction will be the result of, among other things, better buying practices, reduced internal corporate services, asset sales and reductions in payroll expense.

Core Market Analysis/Asset Rationalization Review
● The Company is initiating a market positioning process through which it will evaluate every market in which it operates based on market share, operating results, competitive positioning and activity, growth potential and other factors. Through this process, the Company will identify core markets targeted for future investment and growth and non-core markets to be evaluated for sale or closure. In conjunction with this effort, the Company will conduct an asset rationalization review of all store, manufacturing and distribution facilities.

-18-

Image Makeover Program
● 'We need to change the consumer's opinion of Winn-Dixie,' said Lazaran, 'and the place to begin that effort is in our stores.' The Company is aggressively rolling out an image makeover program, focusing on interior and exterior decor, lighting and the Company's new produce layout. Ninety-eight image makeovers have been completed and approximately an additional 600 stores are targeted for image makeovers over the next 12 months at a total cost of approximately $165.0 million. Additional capital spending will be allocated in core markets as identified in the market positioning analysis to grow share in these core markets.

Comprehensive Process Re-engineering
● The Company also announced a process re-engineering initiative that is intended to enhance organizational effectiveness and accountability. This program is beginning in the central procurement function. 'We understand that the types of changes we are making cannot be accomplished through strategic design alone. We must execute,' Lazaran said. 'When the Company centralized the procurement function, it brought all the people into one place but did not change processes and did not achieve the desired results. This time, we are re-engineering our processes to ensure that we are organized in the most functional way so that we can deliver on the strategy we have developed.'

* * * * *

Based on the current operating results and the expected funding needs for additional capital expenditures, *the Company has decided to suspend indefinitely the declaration of future quarterly dividends*.

56.    The Company's stock dropped from a close of $9.09 on January 29, 2004 to a close of $6.56 on January 30, 2004, on volume of 24.6 million shares.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

57.    At all relevant times, the market for Winn-Dixie common stock was an efficient market for the following reasons, among others:

a.    Winn-Dixie common stock met the requirements for listing, and was listed and actively traded, on the New York Stock Exchange, a highly efficient market;

b.    As a regulated issuer, Winn-Dixie filed periodic public reports with the SEC;

-19-

c.      Winn-Dixie stock was followed by securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers

of their respective brokerage firms. Each of these reports was publicly available and entered the

public marketplace.

d.      Winn-Dixie regularly issued press releases which were carried by national

newswires. Each of these releases was publicly available and entered the public marketplace.

58.     As a result, the market for Winn-Dixie securities promptly digested current

information with respect to Winn-Dixie from all publicly-available sources and reflected such

information in Winn-Dixie's stock price. Under these circumstances, all purchasers of Winn-Dixie

common stock during the Class Period suffered similar injury through their purchase of stock at

artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

59.     The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The

specific statements pleaded herein were not identified as "forward-looking statements" when made.

Nor was it stated with respect to any of the statements forming the basis of this complaint that actual

results "could differ materially from those projected." To the extent there were any forward-looking

statements, there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking

statements pleaded herein, defendants are liable for those false forward-looking statements because

at the time each of those forward-looking was made the particular speaker knew that the particular

forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Winn-Dixie who knew that those statements were false when made.

## SCIENTER ALLEGATIONS

60.     As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding Winn-Dixie and its business practices, their control over and/or receipt of Winn-Dixie's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Winn-Dixie were active and culpable participants in the fraudulent scheme alleged herein. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public. This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances and operations. The ongoing fraudulent scheme described in this complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

61.     The Individual Defendants engaged in such a scheme to inflate the price of Winn-Dixie common stock in order to: (i) protect and enhance their executive positions and the substantial compensation and prestige they obtained thereby; (ii) enhance the value of their personal holdings of Winn-Dixie common stock and options;

**COUNT I**

**Violations Of Section 10(b) Of The
Exchange Act And Rule 10b-5 Promulgated
Thereunder Against All Defendants**

62.     Plaintiff repeats and realleges each and every allegation contained above.

63.     Each of the defendants:  (a) knew or recklessly disregarded material adverse non-public information about Winn-Dixie's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Winn-Dixie.

64.     During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

65.     Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of Winn-Dixie stock during the Class Period.

-22-

66.     Plaintiff and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for Winn-Dixie stock. Plaintiff and the Class would not have purchased Winn-Dixie stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Individual Defendants

67.     Plaintiff repeats and realleges each and every allegation contained above.

68.     The Individual Defendants acted as controlling persons of Winn-Dixie within the meaning of Section 20(a) of the Exchange Act. By reason of their senior executive and/or Board positions they had the power and authority to cause Winn-Dixie to engage in the wrongful conduct complained of herein.

69.     By reason of such wrongful conduct, Winn-Dixie and the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Winn-Dixie stock during the Class Period.

**WHEREFORE,** plaintiff prays for relief and judgment, as follows:

1.     Determining that this action is a proper class action and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

3.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

4.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: February 3, 2004

VIANALE & VIANALE LLP

By: _____

Kenneth J. Vianale
Fla. Bar No. 0169668
Trial Counsel
Julie Prag Vianale
Fla. Bar No. 0184977
5355 Town Center Road, Suite 801
Boca Raton, FL 33486
Tel: (561) 391-4900
Fax: (561) 368-9274

**BERNSTEIN LIEBHARD &
LIFSHITZ LLP**
Mel E. Lifshitz
Keith Fleischman
10 East 40th Street
New York, NY 10016
Tel:     (212) 779-1414
Fax:    (212) 779-3218

**Attorneys for Plaintiff**

-24-

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

I, Louis Rubinstein ("Plaintiff"), declare the following as to the claims asserted under the federal securities laws, that:

1.      Plaintiff has reviewed the complaint filed in this matter and has authorized the filing of a complaint based on similar allegations in a related or amended complaint. Plaintiff retains Bernstein Liebhard & Lifshitz, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.      Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a lead plaintiff either individually or as part of a group. A lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. I understand that the litigation is not settled, this is not a claim form, and sharing in any recovery is not dependent upon execution of this Certification.

4.      Plaintiff's transaction(s) in the WEBX-SECURE SYSTEMS, INC. security that is the subject of this action during the period of October 9, 2002 through and including January 30, 2004 are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---------------|--------------|----------|------|-----------------|
| 1,000 | WDN | Buy | 6/12/2003 | $12.82 |
| | | | | |
| | | | | |
| | | | | |

Please list other transactions on a separate sheet of paper, if necessary.

5.      During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for the class in any action filed under the federal securities laws except as indicated here:

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2nd day of February, 2004.

_____
Signature

Louis Rubinstein
Print Name

1420 58th Street
Address

Brooklyn, New York 11219

(718) 851-1823
Phone Number

_____
Email Address