UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

WINN-DIXIE STORES, INC.
SECURITIES LITIGATION.

Case No.  3:04-cv-71-J-33MCR
Member Cases:
3:04-cv-78-J-33MCR
3:04-cv-84-J-33JRK
3:04-cv-94-J-33MCR
3:04-cv-154-J-33MCR
3:04-cv-138-J-33MCR
3:04-cv-79-J-33MCR
3:04-cv-103-J-33MCR
3:04-cv-153-J-33MCR
3:04-cv-111-J-33MCR

_____/

**ORDER**

This matter comes before the Court pursuant to Defendants'
Motion to Dismiss the Consolidated Complaint (Doc. # 94) filed on
July 23, 2007.  Plaintiff filed a Response in Opposition to the
Motion to Dismiss on August 9, 2007 (Doc. # 99) to which Defendants
filed a Reply Memorandum on August 27, 2007 (Doc. # 103).

**I.   Legal Standard**

On a motion to dismiss, this Court must accept as true all the
allegations in the complaint and construe them in the light most
favorable to the plaintiff.  Jackson v. Bellsouth Telecomms., 372
F.3d 1250, 1262 (11th Cir. 2004).  Further, a court must favor the
plaintiff with all reasonable inferences from the allegations in
the complaint.  Stephens v. Dep't of Health & Human Servs., 901
F.2d 1571, 1573 (11th Cir. 1990) ("On a motion to dismiss, the

facts stated in [the] complaint and all reasonable inferences therefrom are taken as true.")

However, the Supreme Court has recently explained:

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level.

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-1965 (2007)(internal citations omitted).  Further, courts are not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

## II.  **Factual Background**

Lead Plaintiff National Asbestos Workers Pension Fund ("Plaintiff"), individually and on behalf of a putative class (the "Class") of all purchasers of publically traded securities of Winn-Dixie Stores, Inc. ("Winn-Dixie") between August 7, 2002 and January 29, 2004 (the "Class Period") sues three former Winn-Dixie executives: Allen Rowland, Frank Lazaran, and Richard P. McCook (collectively, "Defendants").[1]  Rowland was Winn-Dixie's CEO, President and Director from 1999 until June 26, 2003. (Doc. # 73 at ¶ 16, ¶ 31).  Lazaran was Winn-Dixie's CEO, President and Director

---

[1]  On August 31, 2004, this Court appointed the National Asbestos Workers Pension Fund as the lead Plaintiff in this action. (Doc. # 34) In the same Order, this Court consolidated the above-captioned cases. (Doc. # 34).

from June 26, 2003 until December 10, 2004. (Doc. # 73 at ¶ 17). Prior to serving as CEO, Lazaran served as Winn-Dixie's Chief Operating Officer and Executive Vice President at all relevant times. (Doc. # 73 at ¶ 17).  McCook was Winn-Dixie's Chief Financial Officer and Senior Vice President until he resigned on March 8, 2004.

Winn-Dixie is not a defendant in this case.[2]  Plaintiff's complaint against Defendants arises under the Securities Exchange Act of 1934 (the "Exchange Act"), specifically, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

For the present purpose of deciding the motion to dismiss the Consolidated Complaint, this Court will accept as true all well-pleaded statements of fact, and will draw all reasonable inferences therefrom in the light most favorable to Plaintiff.

A.   **Winn-Dixie's Financial Position**

The Consolidated Complaint tells the story of Winn-Dixie, a grocery store caught between a rock and a hard place:

---

[2]  Winn Dixie filed for protection under Chapter 11 of the United States Bankruptcy Code on February 21, 2005. The parties represent that, through its bankruptcy proceedings, Winn-Dixie has extinguished any alleged liability owed to Plaintiff and other public shareholders. Accordingly, Winn-Dixie has not been named as a defendant in this action. (Doc. # 99 at 8).  However, the Consolidated Complaint indicates "Winn-Dixie is, or has been, responsible for maintaining appropriate director and officer liability insurance coverage for any act or omission of Defendants occurring during the Class Period." (Doc. # 73 at ¶ 19).

The Company's strategic vision was to be the best
supermarket in every neighborhood in which it operates by
offering the best value, the freshest products and
outstanding customer service every day, while enhancing
shareholder value.  In reality, however, Winn-Dixie was
a company suffering through an identity crisis due to its
positing between upscale operators, such as Publix, and
discount chains, such as Wal-Mart.

(Doc. # 73 at ¶ 27).

The Consolidated Complaint explains that Rowland came aboard
as CEO when Winn-Dixie "was teetering on the edge of a financial
meltdown." (Doc. # 73 ¶ 1).[3]  Plaintiff indicates that Rowland
spearheaded centralization of Winn-Dixie's major functions,
"including procurement, marketing, merchandising, and
transportation, which historically had been performed at the local
level." (Doc. # 73 at ¶ 2).  Plaintiff explains that, through
centralization, "Rowland expected that [Winn-Dixie] would realize
the benefits of improved efficiency, lower costs and increased
purchasing power." (Doc. # 73 at ¶ 2).  Plaintiff further states,
"Rowland's centralization initiatives represented a significant
departure from how the Company had been operated, but were viewed
by Rowland and his management team as a necessary step to make
Winn-Dixie more competitive." (Doc. # 73 at ¶ 34).

---

[3] The Consolidated Complaint states, "During the late 1990's,
Winn-Dixie . . . had been caught in a death spiral.  Severely
hampered by an inefficient decentralized operating structure, and
unable to compete successfully with other retailers . . . the
Company had been teetering on the edge of a financial meltdown."
(Doc. # 73 at ¶ 1).

Despite management's efforts to reorganize Winn-Dixie's operations, Winn-Dixie lost its competitive edge, and suspended its dividend indefinitely on January 30, 2004. (Doc. # 73 at ¶ 9). The market reacted negatively and the value of Winn-Dixie's shares plummeted. Winn-Dixie filed for bankruptcy on February 21, 2005. (Doc. # 73 at ¶ 10).

The Consolidated Complaint describes Winn-Dixie's declining state through the medium of anonymous former Winn-Dixie employees. The Consolidated Complaint asserts, "According to a former accounts payable analyst, despite attempts to lower prices in response to the competitive threat from Wal-mart, the Company could not successfully compete with Wal-Mart on price." (Doc. # 73 at ¶ 29). The Consolidated Complaint further asserts, "According to a former accounts payable accountant, Winn-Dixie did not have the personnel or the systems that could provide accurate, up-to-date information." (Doc. # 73 at ¶ 30). In addition, the Consolidated Complaint alleges, "A former senior procurement manager indicated that there were many reasons why the benefits and objectives to be derived from Winn-Dixie's centralization initiatives didn't happen." (Doc. # 73 at ¶ 38).

Defendants question the propriety of Plaintiff's use of confidential sources. Plaintiff's use of the anonymous sources, however, is appropriate under the circumstances of this case because Plaintiff has given relevant information about the former

employees, such as the duration of their service at Winn-Dixie and a description of the work that they performed. See Marrari v. Medical Staffing Network Holdings, Inc., 395 F. Supp. 2d 1169, 1188 (S.D. Fla. 2005)(adopting rule that "anonymous sources may be used to sustain complaints under the PSLRA so long as the sources are described with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") Notwithstanding this determination, the information provided by the anonymous witnesses is not particularly helpful to this Court because the witnesses did not provide information about what Defendants actually knew at the time certain challenged representations were made.   Instead, the witnesses simply provided a subjective account of how centralization and other management initiatives impacted their work in different regions.

   **B.   Defendants' Statements to the Public**

    In addition to cataloguing Winn-Dixie's corporate struggles, the Consolidated Complaint charges that Defendants intentionally defrauded investors by making material misrepresentations and omissions about Winn-Dixie's centralization initiatives. Specifically, Plaintiff complains that Defendants "touted" the benefits of Winn-Dixie's centralization initiatives including "improved efficiency, lower costs, increased purchasing power . . . and gross margin improvement" while, in reality, Winn-Dixie's

centralization initiatives were an abysmal failure. (Doc. # 73 at ¶¶ 2-3).

The Consolidated Complaint quotes numerous statements made by Rowland, Lazaran, and McCook and alleges that these statements were false or rendered misleading due to fatal omissions of material facts. The Consolidated Complaint identifies at least thirty-four communications made by either Rowland, Lazaran, or McCook that Plaintiff alleges violated the Exchange Act. For instance, Plaintiff highlights the following statement made by Rowland during a conference call on August 8, 2002: "We are excited about improved sales in profits in fiscal 2002. [With] the restructure completed during the previous two years, we shifted focus to profitable growth. We are committed to continue operational improvements and financial results show that our customers are noticing." (Doc. # 73 at ¶ 60).

In addition, Plaintiff points to the following statement by Lazaran on June 12, 2003:

> Our cost reduction initiatives enable us to sustain profitability levels and to invest in technology for our future even when sales slightly soften. We continue to fine-tune our labor scheduling to ensure that we have the right associates working at the right time of the day to meet our customers' needs. This is just one of the operational efficiencies that have been successfully implemented.

(Doc. # 73 at ¶ 92).

Further, Plaintiff identifies the following statement by McCook at an August 8, 2003, conference call:

7

I think in the last couple of years we have done a very good job as far as getting a lot of costs out . . . . I think the restructuring from a cost standpoint, we're in very good shape and what we're at for this point is getting our sales back, and as we do, start driving it, and I think over the next several years as we start driving customers, you will see us getting more price competitive and starting driving gross profit percentage of sales down and, as we leverage those expenses, you know, the last couple of years, we were going the opposite way.  Now, we're going to start driving sales, continuing to lower prices, we have a good handle on expenses and that's the way we'll build profitability on the cash flow of the business.

(Doc. # 73 at ¶ 101).

The Consolidated Complaint does not provide an individualized assessment of why each purportedly false or misleading statement violates the Exchange Act.  Instead, the Consolidated Complaint repeats the following refrain throughout the catalogue of allegedly fraudulent statements:

The statements [of Defendants] . . . were materially false and misleading because . . . Defendants omitted and actively concealed that:
(a)   the Company's centralization efforts, which were initiated by Rowland and continued by Lazaran, were a failure and did not lead to reduced expenses or operational efficiencies;
(b)   The Company's management was not sufficiently committed to the success of the centralization initiatives because they were focused on several concurrent projects and did not commit adequate resources to ensure that the centralization initiatives were properly implemented;
(c)   The Company's centralized procurement of goods led to bloated  inventories and increased spoilage, forcing retail stores to lower prices below cost to reduce excessive inventory and offset spoilage losses, which had a negative impact on the Company's financial performance;
(d)   the Company's centralized marketing strategies were ineffective because they were not tailored to the

specific geographic regions and stores for which
they were designed and thus disregarded actual
consumer demand;

(e)   as a result of the failed centralization
initiative, the Company had increased its retail
prices which led to a loss of consumers, a decrease
in sales, and a further reduction in gross margins;
and

(f)   Defendants recognized the need for major changes
within the Company as they had been conducting an
ongoing "comprehensive review" of the Company's
business strategy that they knew would
significantly impact the future direction of the
Company.

(Doc. # 73 at ¶ 95(a)-(f)).

Defendants contend, and this Court agrees that "Plaintiff

fails to explain how its litany of fraud accusations relates to the

vast bulk of the challenged statements." (Doc. # 94 at 10).

Count One of the Consolidated Complaint is asserted against

all three Defendants under Section 10(b) of the Exchange Act and

Rule 10b-5 promulgated thereunder.   Count One states in part:

During the Class Period, Defendants carried out a plan,
scheme, and course of conduct which was intended to and
did: (a) deceive the investing public, including
Plaintiff and other Class members, (b) artificially
inflate and maintain the market price of Winn-Dixie's
publically traded securities; (c) cause Plaintiff and
other members of the Class to purchase Winn-Dixie's
publically traded securities at artificially inflated
prices. . . . Defendants employed devices, schemes, and
artifices to defraud; made untrue statements of material
fact and/or omitted to state material facts necessary to
make the statements not misleading; and engaged in acts,
practices, and a course of business which operated as a
fraud and deceit upon the purchasers of the Company's
securities in an effort to maintain artificially high
market prices for Winn-Dixie's securities in violation of
Section 10(b) of the Exchange Act and Rule 10b-5.

(Doc. # 73 at ¶¶ 136-137).

Count Two of the Consolidated Complaint is asserted against each Defendant under Rule 20(a) of the Exchange Act as follows:

> Defendants acted as a controlling person of Winn-Dixie within the meaning of Section 20(a) of the Exchange Act. . . . By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various false and misleading statements. Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected. In addition, Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

(Doc. # 73 at ¶¶ 148-149).

This Court finds that the Consolidated Complaint describes Winn-Dixie's failed attempt to improve its operations through various reforms, such as centralization; however, the Consolidated Complaint fails to state a claim against Defendants for violations of the Exchange Act or its accompanying Regulations. For the reasons that follow, the Consolidated Complaint is dismissed.

## III. **Analysis**

### A.   **Count One**

Count One of the Consolidated Complaint is asserted against Defendants under Section 10(b) and Rule 10b-5 of the Securities and

Exchange Act.  Section 10(b) of the Exchange Act states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Regulation 10b-5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to defraud, (b) to make any untrue statement of material fact or to omit to state a material fact in order to make the statement made, in light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

The Eleventh Circuit provided the following framework for analyzing a motion to dismiss Section 10(b) and Rule 10b-5 claims in <u>Ziemba v. Cascade Int'l, Inc.</u>, 256 F.3d 1194, 1202 (11th Cir. 2001): "In order to state a claim under § 10(b) and Rule 10b-5, a plaintiff must show the following: (1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) on which plaintiff relied, (5) that proximately caused his injury."  <u>See also</u> <u>Instituto De Prevision Militar v. Merrill Lynch & Co., Inc.</u>, 05-cv-22721, 2007 U.S. Dist. LEXIS 72742, at *7 (S.D. Fla. Sept. 28, 2007)(same).

**B.**   **Heightened Pleading Requirements**

The Supreme Court has evaluated the pleading requirements for securities claims, such as the present one, and has determined that such pleadings are subject to a heightened pleading standard. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509 (June 21, 2007)("plaintiffs [must] state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e. the defendant's intention to deceive, manipulate, or defraud.") Id. at 2504. (Citing Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 (1976)).

The Court in Tellabs explained the impact of the Private Securities Litigation Reform Act of 1995 ("PSLRA") on cases such as the present one: "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Tellabs, Inc., 127 S. Ct. at 2509 (citing 15 U.S.C. § 78u-4(b)(1)-(2)).[4]

---

[4]   The Tellabs decision provides a thorough discussion of the legislative intent behind the PSLRA:

> Setting a uniform pleading standard for § 10(b) actions was among Congress' objectives when it enacted the PSLRA. Designed to curb perceived abuses of the § 10(b) private action—nuisance filings, targeting of deep-pocket

The heightened pleading requirements of the PSLRA compliment and supplement the requirements for pleading fraud under Federal Rule of Civil Procedure 9(b). <u>Sides v. Simmons</u>, 07-cv-80347, 2007 U.S. Dist. LEXIS 70527, at *10 (S.D. Fla. Sept. 24, 2007)("[The PSLRA] goes further than Rule 9(b)").

Federal Rule of Civil Procedure 9(b) states, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.   Malice, intent, knowledge, and other conditions or mind of a person may be averred generally."

The court in <u>Ziemba</u>, 256 F.3d at 1202 stated, "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each statement and the person responsible for making (or, in the case of

---

defendants, vexatious discovery requests and manipulation by class action lawyers-the PSLRA installed both substantive and procedural controls.  Notably, Congress prescribed new procedures for the appointment of lead plaintiffs and lead counsel.  This innovation aimed to increase the likelihood that institutional investors-parties more likely to balance the interests of the class with the long-term interests of the company-would serve as lead plaintiffs.  Congress also limited recoverable damages and attorney's fees, provided a safe harbor for forward-looking statements, mandated imposition of sanctions for frivolous litigation, and authorized a stay of discovery pending resolution of any motion to dismiss.

127 S. Ct. 2499 at 2508.(internal citations omitted).

omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud."

### 1.   **Misstatement or Omission of a Material Fact**

The Consolidated Complaint cannot survive unless it contains at least one misstatement or omission of a material fact. Defendants contend that Plaintiff has failed to name a single material omission or misstatement. Further, Defendants contend that the statements identified by Plaintiff fall into one of two categories: (1) non-actionable immaterial puffery or (2) forward-looking statements protected by the PSLRA's safe harbor.[5] After careful evaluation of the Consolidated Complaint, this Court finds that the Consolidated Complaint fails to identify a material misstatement or omission and that the complaint is due to be dismissed.

### a.   **Materiality**

Materiality was discussed thoroughly in _Basic Inc. v._

---

[5] The PSLRA's safe harbor was explained in _Harris v. Ivax Corp._, 182 F.3d 799, 803 (11th Cir. 1999) as follows: The PSLRA "provides a safe harbor from liability for certain 'forward-looking statements.' In that safe harbor, corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement. Even if the forward-looking statement has no accompanying cautionary language, the plaintiff must prove that the defendant made the statement with actual knowledge that it was false or misleading."

Levinson, 485 U.S. 224, 232 (1988).  In Basic Inc., the Court
determined that a fact is material if there is a "substantial
likelihood that the disclosure of the omitted fact would have been
viewed by the reasonable investor as having significantly altered
the 'total mix' of information made available." Id. at 232.  The
Court further explained that a rigid test for materiality is
inappropriate because "the determination of materiality requires
delicate assessments of the inferences a reasonable shareholder
would draft from a given set of facts and the significance of those
inferences to him." Id. at 236 (citing TSC Indus. v. Northway, 426
U.S. 438, 450 (1976)).[6]

In addition, the court in Oxford Asset Management v. Jaharis,
297 F.3d 1182, 1189 (11th Cir. 2002) noted that "the trier of fact
usually decides the issue of materiality."  However, if it is plain
that the alleged omission or misstatement is unimportant and
reasonable minds could not differ on the question of importance, it

_____

[6] The Basic Inc., Court also refers to the Advisory Committee
on Corporate Disclosure's recommendation as to materiality to the
SEC: "Although the Committee believes that ideally it would be
desirable to have absolute certainty in the application of the
materiality concept, it is its view that such a goal is illusory
and unrealistic.  The materiality concept is judgmental in nature
and is not possible to translate this into a numerical formula.
The Committee's advice to the SEC is to avoid the quest for
certainty and to continue consideration of materiality on a case-
by-case basis as problems are identified." Basic Inc. 485 U.S. at
236, n. 14 (citing Report of the Advisory Committee on Corporate
Disclosure to the Securities and Exchange Commission 327 (House
Committee on Interstate and Foreign Commerce, 95th Cong., 1st Sess.)
(Comm. Print) (1997)).

is proper for this Court to pronounce a misstatement or omission immaterial as a matter of law. Id.

### b.   Vague Corporate Optimism and Puffery

In the case of In re S1 Corp. Securities Litigation, 173 F. Supp. 2d 1334, 1350-1351 (N.D. Ga. 2001), the court commented on the established rule that non-material "puffing" statements cannot support a securities fraud claim because such statements are too vague to verify and are immaterial.

Specifically, the court noted, "Statements classified as 'corporate optimism' or 'mere puffing' are typically forward-looking statements, or are generalized statements of optimism that are not capable of objective verification. Vague, optimistic statements are not actionable because reasonable investors do not rely on them in making investment decisions." Id. (Citing Grossman v. Novell, Inc., 120 F.3d 1112 (10th Cir. 1997)). The S1 Corp. case further noted that "sales figures, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty." 173 F. Supp. 2d at 1350.

The S1 Corp. court thoroughly discussed and relied upon the case of Grossman, 120 F.3d at 1122, in which the Tenth Circuit affirmed a district court's classification of the following statements as non-material puffery: (1) the CEO's statement that the company had experienced "substantial success in the integration of the sales forces and operations" of the two companies, that the

16

merger was moving "faster than we thought it would" and that the merger presented a "compelling set of opportunities" for the company; (2) the company's statements that "by moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge of the expanding scope of network solutions" and that management "expects that network applications will quickly reshape customer expectations." Grossman, 120 F.3d at 1115.

The Grossman court indicated "these are the sort of soft, puffing statements, incapable of objective verification, that courts routinely dismiss as vague statements of corporate optimism." Id. at 1121. See also In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 891 (W.D. N.C. 2001)(statement that "we are very pleased with our progress in integrating recent acquisitions and with the growth prospectus stemming from these transactions" is "puffery" and clearly immaterial); Kane v. Madge Networks N.V., C-96-20652, 2000 U.S. Dist. LEXIS 19984, at *3 (N.D. Cal. May 27, 2000)("Merging companies will always predict that they will integrate their sales forces and management teams and that they will achieve 'synergies' from the combination. Reasonable investors know better than to rely on these statements, which are all too familiar to market observers"); In re Peritus Software Servs., Inc. Sec. Litig., 52 F. Supp. 2d 211, 220 (D. Mass. 1999)(finding the following statements to be non-actionable, vague statements of corporate optimism or puffery: "the acquisition . .

17

. has been a success," "[we have] completed the acquisition," and "this confirms our belief that clients can easily leverage the combined product suites."); In re Advanta Corp. Securities Litig., 180 F.3d 525, 538 (3d Cir. 1999)("General, non-specific statements of optimism or hope even if arguably misleading, do not give rise to a federal securities claim because they are not material.").

### c.   Omissions

The Eleventh Circuit has described actionable omissions as follows:

> A defendant's omission to state a material fact is proscribed only when the defendant had a duty to disclose. This Court has recognized that a duty to disclose arises not only where a defendant's failure to speak would render the defendant's own prior speech misleading or deceptive, but also where the law imposes special obligations, as for accountants, brokers, and other experts, depending on the circumstances of the case. Some factors that we consider in determining whether a duty to disclose exists include: the relationship between the plaintiff and defendant, the parties' relative access to the information to be disclosed, the benefit derived by the defendant from the purchase or sale, defendant's awareness of Plaintiff's reliance on defendant in making its investment decision, and defendant's role in initiating the purchase or sale. Other factors that we consider include the extent of the defendant's knowledge and the significance of the misstatement, fraud, or omissions, as well as the extent of the defendant's participation in the fraud.

Ziemba, 256 F.3d at 1206. (Internal citations omitted).

Several cases have discussed the duty to disclose mismanagement and have determined that corporate officers do not have a duty to disclose internal management problems to shareholders.   See Superintendent of Ins. v. Bankers Life and

18

Casualty Co., 404 U.S. 6, 12 (1971) ("We agree that Congress by §
10(b) did not seek to regulate transactions which constitute no
more than internal corporate mismanagement."); In re Telecom Ltd.
Sec. Litig., 116 F. Supp. 2d 446, 459 (S.D.N.Y. 2000)("A company is
generally not obligated to disclose internal problems because the
securities laws do not require management to bury the shareholders
in internal details and because public disclosure of internal
management and engineering problems falls outside the securities
laws.")(internal citations omitted); In re Allscripts, Inc. Sec.
Litig., 2001 U.S. Dist. LEXIS 8897, at *16-17 (E.D. Ill. June 28,
2001)("[A] duty to disclose [declines in customer satisfaction with
company's products] would not comport with the way the business
world works.")

     Furthermore, the Supreme Court has emphasized that § 10(b) was
not enacted to prevent corporate mismanagement or similar breaches.
In the case of Santa Fe Industries, Inc. v. Green, 430 U.S. 462,
479 (1977), various minority shareholders sued petitioner under §
10(b), arguing that petitioner effected a merger that treated
minority shareholders unfairly.  The Court determined that the
minority shareholders' complaint should have been dismissed because
"[c]orporations are creatures of state law, and investors commit
their funds to corporate directors on the understanding that,
except where federal law expressly requires certain
responsibilities of directors with respect to stockholders, state

19

law will govern the internal affairs of the corporation." 430 U.S. at 496. (Internal citations omitted).

### d.   <u>Misstatements</u>

The PSLRA's "safe harbor" allows defendants to argue at the motion to dismiss stage that the statements at issue were "forward-looking statements" <u>Harris</u>, 182 F.3d at 803.  Indeed, liability for forward-looking statements can be avoided if such statements are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward -looking statement." <u>Id.</u>; 15 U.S.C. § 78u-5(c)(1)(A)(i).  Further, even if the forward-looking statement has no accompanying cautionary language, a plaintiff must show that the defendant made the statement with "actual knowledge" that it was "false or misleading." <u>Harris</u>, 182 F.3d at 803; 15 U.S.C. § 78u-5(c)(1)(A)(I).

### <u>The Complaint Lacks a Material Misstatement or Omission</u>

This Court has reviewed each and every allegation contained in the Consolidated Complaint; however, in rendering this opinion, it is not necessary for this Court to quote each allegedly false or misleading statements and omissions in this Order.  Instead, this Court will analyze a representative selection of the alleged misrepresentations as follows.

The Consolidated Complaint alleges that the following August 7, 2002 statement by Rowland is misleading:

> We are pleased to see positive identical store sales of 1.2% for the fourth quarter.  Our focus on sales includes our commitment to operate the best store in the neighborhood, provide value to our customers, and attract customers through exciting marketing programs, including our Customer Reward Card.  For fiscal 2003 we will continue to concentrate on the total shopping experience for our customers, as well as our own operational efficiencies.

(Doc. # 73 at ¶ 59).

The Eleventh Circuit requires Plaintiff to isolate each statement alleged to be false and explain why it is false. See Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006)("For claims brought under the Exchange Act, including Appellants' claims under Section 10b and Section 20a, the complaint must specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.")  The Consolidated Complaint does not satisfy the Eleventh Circuit's standards.  The August 7, 2002, statement above contains many general statements, including Rowland's goals for the future, and vague statements of corporate optimism.  These statements are not capable of verification and are immaterial.  Further, the statement that "we are pleased to see positive identical store sales of 1.2% for the fourth quarter" appears to be a verifiable, factual statement; however, Plaintiff has not explained why it is false.

21

Plaintiff has simply failed to isolate specific statements alleged to be false, and has failed to explain exactly why such statements are false.[7]

Another example is Rowland's August 8, 2002, statement as follows:

> We are excited about improved sales in profits in fiscal 2002. [With] the restructure completed during the previous two years, we shifted focus to profitable growth. We are committed to continue operational improvements and financial results show that our customers are noticing.

(Doc. # 73 at ¶ 60). This statement is primarily a statement of unverifiable corporate optimism; however, one part of the statement is verifiable: that "sales in profits in fiscal 2002" improved. Nonetheless, Plaintiff's Consolidated Complaint fails to specifically charge that the "sales in profits" statement was false, and, even if this Court were to presume that Plaintiff so charged, Plaintiff fails to explain why the statement is false.

Along the same lines, Plaintiff complains that McCook's August 8, 2002, statement that follows violates the Exchange Act:

> Increased gross profit is largely a result of improvements and procurements obtained from lower cost of product and implementing competitive retail pricing strategy. Continued improvement in gross profit dollars is anticipated through enhanced procurement practices and promotional activities.

---

[7] The statements in the 2002 Annual Report to shareholders are similarly not actionable. Most of the statements are immaterial and not capable of verification. As for the statements of fact that are verifiable, Plaintiff has not set forth why such statements are false. (Doc. # 73 at ¶ 64).

(Doc. # 73 at ¶ 61).   However, it is clear that this statement is immaterial because it is too vague to verify.   "Improvements" and "procurements" are nonspecific, abstract concepts, as are "anticipated" "improvements."   It would be inappropriate for this Court to find such a statement actionable under the Exchange Act.

Yet another example is the following statement by McCook at an August 8, 2003, conference call:

> I think in the last couple of years we have done a very good job as far as getting a lot of costs out . . . I think the restructuring from a cost standpoint, we're in very good shape and what we're at for this point is getting our sales back, and as we do, start driving it, and I think over the next several years as we start driving customers, you will see us getting more price competitive and starting driving gross profit percentage of sales down and, as we leverage those expenses, you know, the last couple of years, we were going the opposite way.  Now, we're going to start driving sales, continuing to lower prices, we have a good handle on expenses and that's the way we'll build profitability on the cash flow of the business.

(Doc. # 73 at ¶ 101).

Here, McCook states his subjective feelings with "I think" statements, comments on future goals, and generally praises the steps taken by management to cut costs.   Nothing stated by McCook is a verifiable statement of fact, and no investors would consider the information provided in the statements above significant or important in the mix of information available with respect to making an investment decision.

In addition, Plaintiff lists the following statement by Lazaran as false or misleading:

Our cost reduction initiatives enable us to sustain profitability levels and to invest in technology for our future even when sales slightly soften. We continue to fine-tune our labor scheduling to ensure that we have the right associates working at the right time of the day to meet our customers' needs. This is just one of the operational efficiencies that have been successfully implemented.

(Doc. # 73 at ¶ 92).

As with the other statements alleged to be false, this statement is replete with statements of future goals, puffery, vague statements of corporate optimism, and other immaterial and unverifiable statements. No reasonable investor would make an investment decision based on any component of this statement.

Each and every statement alleged to be fraudulent by Plaintiff is either (1) a forward looking statement protected by the PSLRA's safe harbor or (2) clearly immaterial corporate puffery. In addition, the alleged material omission--that Defendants failed to disclose that centralization was a failure--is akin to a failure to disclose mismanagement, which is not actionable. See Santa Fe Industr., Inc., 430 U.S. at 479 (Securities law regulates disclosure of information, not the mismanagement of a company). As stated in Cutsforth v. Renschler, 235 F. Supp. 2d 1216, 1243 (M.D. Fla. 2002), "courts generally hold that the failure to disclose possible corporate mismanagement does not state a federal securities law claim." The court in Cutsforth relied on the Third Circuit case of Craftmatic Securities Litigation v. Kraftsow, 890 F.2d 628, 640 (3d Cir. 1989), which held, "where the incremental

24

value of disclosure is solely to place potential investors on notice that management is culpable of a breach of faith or incompetence, the failure to disclose does not violate the securities acts."

Reminiscent of a mantra, the Consolidated Complaint repeats the allegation that "centralization was a complete failure." This Court determines that the Consolidated Complaint's description of centralization's alleged failure, including the allegation that management lacked commitment to the centralization efforts, that management was focused on other matters, and that management faced significant challenges in response to centralization, is a description of alleged mismanagement. There was no duty to disclose that management engaged in multi-tasking to address challenges associated with centralization. Similarly, there was no duty to disclose challenges posed by shifting from a regional to a centralized system.

Furthermore, even if this Court were to assume that Defendants had a duty to disclose centralization's failure, the Consolidated Complaint does not provide the information that would be necessary for this Court to uphold the Consolidated Complaint in this regard. This is because the Consolidated Complaint does not adequately explain why Defendants' statements about centralization were false, or rendered false by omission, at the time that the statements were made.

Defendants correctly note, "while Plaintiff alleges that Lazaran eventually concluded–at the end of January 2004 after a six-month comprehensive review of the Company's entire business–that Winn-Dixie had not implemented certain of its reform efforts as successfully as it might have hoped, this does not explain how any challenged statement concerning the centralization efforts was false or misleading when made. Plaintiff's attempt to hang a fraud claim on this statement is an impermissible assertion of fraud by hindsight, which the Reform Act was designed to eliminate." (Doc. # 94 at 14)(citations omitted).

At the core of Plaintiff's Consolidated Complaint is the allegation that Defendants made representations about Winn-Dixie's centralization that were false, or misleading due to the omission of information about the flaws in the centralization process. However, Plaintiff has not pled facts supporting the argument that Defendants knew that centralization was a failure when the statements were made. Furthermore, Defendants had no duty to discuss the bumps along the road to centralization, or the fact that centralization posed new challenges in Winn-Dixie's respective divisions. Nonetheless, this Court will continue its analysis of the remaining elements necessary to establish a violation of the Section 10(b) and Rule 10b-5 of the Exchange Act.

### e.  <u>Scienter</u>

The Supreme Court established the standard for pleading

26

scienter in a Section 10(b) fraud action in the case of Tellabs. There, the Court instructed: "A plaintiff alleging fraud in a Section 10(b) action, we hold today, must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.   At trial, she must then prove her case by a preponderance of the evidence.   Stated otherwise, she must demonstrate that it is more likely than not that the defendant acted with scienter." Tellabs, 127 S. Ct. at 2513.[8]

In Tellabs, the trial court determined that a securities fraud complaint sufficiently pleaded scienter.   The Supreme Court remanded the case with instructions regarding the requirements for pleading scienter:

> The strength of an inference cannot be decided in a vacuum.   The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.   The inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences. . . . Yet the inference of scienter must be more than merely reasonable or permissible it must be cogent and compelling, thus strong in light of other explanations.   A complaint will survive, we hold, only if

---

[8] See also Section 78u-4(b)(2): "In any private action arising under this Chapter, in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Tellabs, 127 S. Ct. at 2510 (internal citations omitted).

The Supreme Court further determined that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. . . . In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Tellabs, 127 S. Ct. at 2511.

The Eleventh Circuit has followed Tellabs and added that "merely alleging scienter in general, conclusory terms does not meet the particularity requirement." Garfield, 466 F.3d at 1270. In addition, "the Eleventh Circuit adheres to the rule that a showing of severe recklessness satisfies the scienter requirement." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 (11th Cir. 1999). As stated in Garfield, 466 F.3d at 1264, "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger or misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."

In the present case, Plaintiff argues that scienter is established because Lazaran made two "admissions" on January 30, 2004, tending to show that he knew centralization was a failure. First, Lazaran communicated that he led Winn-Dixie's senior management team in a "comprehensive review" of Winn-Dixie's "entire business model" and planned "a series of major action" for change. Second, Lazaran stated, "when the Company centralized the procurement function, it brought all the people into one place, but did not change processes and did not achieve the desired results." (Doc. # 73 at ¶ 112).  Plaintiff characterizes these "admissions" as the "linchpin" of Defendants' scienter. (Doc. # 99 at 1).

Plaintiff is attempting to argue fraud by hindsight, which is impermissible.  Conspicuously absent from the Consolidated Complaint is any specific factual allegation that Defendants knew that the challenged statements were false when the statements were made.  Plaintiff's argument that Lazaran's January 2004 statements criticizing centralization somehow raise a strong inference that management's prior, optimistic statements about centralization were false when made is ineffective.  The link is simply missing. Defendants assert that Plaintiff's "transparent attempt to plead fraud-by-hindsight fails, particularly since the Complaint confirms that the January 2004 statements were based on changed circumstances and new information, including a recent downturn in performance and the conclusion of the 'comprehensive review' which,

according to Plaintiff, was not even begun when the statements allegedly 'touting' centralization were made." (Doc. # 103 at 2). This Court adopts Defendants' well-crafted argument on this point.

Plaintiff further submits that it is not possible that Defendants neglected to discover centralization's failure (which started in 2002) until 2004 (when Lazaran announced for the first time that centralization was not successful) because Defendants were actively involved in the company's affairs.  Plaintiff explains that management was involved in the details of Winn-Dixie's centralization, attended meetings to discuss "the numbers" (Doc. # 73 at ¶ 57) and were considered "hands on" executives. (Doc. # 73 at ¶ 31).

However, this Court agrees with Defendants' contention that "Plaintiff's vague allegations about meetings allegedly addressing the 'numbers' forecast for certain centralization projects do not establish that Defendants were aware of any alleged problems in implementing centralization efforts; nor would Defendants' awareness of any such problems raise a strong inference of scienter as to the alleged 'fraud' in any event." (Doc. # 94 at 3).

Furthermore, the court in Coca-Cola Enters., Inc. Secs. Litig., 510 F. Supp. 2d 1187, at *26 (N.D. Ga. 2007) noted, "it is not enough to make conclusory allegations that Defendants had access to the 'true facts' in order to demonstrate scienter, particularly when the complaint fails to allege which defendant

30

knew what, how they knew it, or when. . . . Nor does a vague assertion that a defendant must have known about the fraud by virtue of his position of authority suffice to prove a strong inference of scienter." The Eleventh Circuit similarly rejected a plaintiff's attempt to establish scienter by alleging that the defendant attended a meeting to discuss every aspect of the business. Garfield, 466 F.3d at 1264. The Eleventh Circuit determined that the compliant failed to plead scienter on this basis because plaintiff did not explain "what was said at the meeting, to whom it was said, or in what context." Id. at 1265.

As in Garfield, the Consolidated Complaint crafted by Plaintiff fails to plead scienter with the specificity required to survive Defendants' motion to dismiss. Plaintiff's allegation that Defendants were in a position of power at Winn-Dixie and had access to information about the company through business meetings is not sufficient to plead scienter.

This Court finds that the Consolidated Complaint fails to plead scienter with the level of specificity required to survive the instant motion to dismiss.

### f.  Reliance

Defendants contend that Plaintiff has completely failed to allege any type of reliance on the statements and omissions at issue. This Court disagrees. The Consolidated Complaint attempts to establish the element of reliance under the fraud on the market

31

theory; however, Plaintiff's allegations are insufficient to avail Plaintiff of the fraud on the market theory and its favorable presumptions. (Doc. # 73 at ¶ 121).

Illuminating the "fraud on the market" theory of reliance, the Supreme Court has recognized that "modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases." <u>Basic, Inc.  v. Levinson</u>, 485 U.S. 224, 240-47 (1988). National securities markets, the Court observed, are "impersonal and well-developed" and thus, generally incorporate all publically available information, including material misstatements. <u>Id.</u> at 246.  The Court thus adopted the "fraud on the market" theory, which relieves the plaintiffs of the burden of demonstrating actual, individualized reliance on a defendant's misstatement by providing a rebuttable presumption that the plaintiff relied on the "integrity of the market price," which incorporated the misstatement.

The Supreme Court instructs that "[the fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the statements." <u>Id.</u> at 241-242.

32

In order to establish "fraud on the market," a plaintiff must show: (1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed. Id. at 247; See also Greenberg v. Crossroads Sys., 364 F.3d 657, 661 (5th Cir. 2004).

In this case, there is no public, material misrepresentation, and accordingly, Plaintiff may not rely on the fraud on the market theory of reliance. Reliance is absent from the Consolidated Complaint, justifying dismissal of Count One.

### g.  **Causation**

The Supreme Court discussed the importance of pleading and proving causation in securities fraud cases. See Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005). In Dura Pharm, stock purchasers sued the corporate directors of a pharmaceutical company for securities fraud, alleging that the corporate directors falsely stated that the corporation's device would receive federal approval. The device did not receive federal approval, and the price of the stock plummeted. The purchasers asserted that they suffered damages based on the artificially inflated price of the corporation's stock which resulted from the alleged misrepresentation.

The Court held that "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss" and the absence of such a requirement "would tend to transform a private securities action into a partial downside insurance policy."

In this case, because the Consolidated Complaint fails to sufficiently allege that Defendants made a material misrepresentation or omission, there can be no causation. Dismissal of Count One is therefore justified.

## Conclusion

The Eleventh Circuit expounded on the purpose of the PSLRA stating, "An important component of achieving this goal [curbing abusive securities litigation] was structuring the legislation to permit the dismissal of frivolous cases at the earliest feasible stage of the litigation, thereby reducing the cost to the company, and by derivation, to its shareholders, in defending a baseless action." Bryant, 187 F.3d at 1278.

This Court dismisses Count One because Plaintiff has failed to meet it burden under the heightened pleading requirements of the PSLRA. The Consolidated Complaint, spanning over fifty pages, recounts an unfortunate chapter in Winn-Dixie's corporate life. Facing fierce competition for its market share, Winn-Dixie was forced to pursue new business initiatives aimed at cutting the fat, gaining new customers, and increasing the bottom line. These

initiatives included, among other things, centralization-an initiative spearheaded by Rowland. Defendants reported to investors that these new initiatives were in progress. Defendants offered cautious, vague statements about centralization that were not verifiable. In addition, Defendants did make some representations that were specific and could be considered significant. Nonetheless, Plaintiff has not identified these concrete statements or explained why they were false at the time that they were made.

In addition, the Consolidated Complaint, when read as a whole, does not meet the PSLRA's requirements for pleading scienter because the allegations do not support an inference that the Defendants knew or really should have known that the targeted statements were false at the time that they were made or otherwise lacking necessary information.

As there are no actionable misstatements, no actionable omissions, and no scienter, there can be no reliance or causation, elements required to sustain Count One of Plaintiff's Consolidated Complaint. As Plaintiff has not met its burden for pleading a fraud claim under Section 10(b) or Rule 10b-5, Count One is dismissed.

### C.   Count Two

Count Two of the Consolidated Complaint is asserted against Defendants under Section 20(a) of the Exchange Act, which states:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or

regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation of cause of action.

Plaintiff alleges that Defendants wielded control over Winn-Dixie and "[b]y virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various false and misleading statements." (Doc. # 73 at ¶ 148).

To overcome a Rule 12(b)(6), Fed.R.Civ.P., motion to dismiss, a plaintiff who asserts "controlling person" claims must allege that the defendant had the power to control both the general affairs of the primary violator and the specific corporate policy that resulted in the primary violation. See Brown v. Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996). However, Section 20(a) liability is dependent on a finding of primary liability. See Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001)(dismissing Section 20(a) count after finding no violation of Section 10(b) or 10b-5); In re Sawtek, Inc. Secs. Litig., 6-03-cv-294, 2005 U.S. Dist. LEXIS 39223 (M.D. Fla. Oct. 6, 2005), at *45("[P]ursuant to the requirements of the Reform Act, Defendants are entitled to dismissal of the Section 10(b) claims.  As controlling person

liability in this case depends upon Section 10(b) liability, the Section 20(a) claims must also be dismissed.").

As this Court has determined that the Consolidated Complaint fails to state a claim against Defendants under Section 10(b) and Rule 10b-5, Plaintiff's dependent Section 20(a) claim must also fail.  Accordingly, Count Two is dismissed.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)     Defendants' Motion to Dismiss the Consolidated Complaint (Doc. # 94) is **GRANTED**.

(2)     The Clerk is directed to enter Judgment in favor of Defendants in each of the following cases and to close each of the following cases: 3:04-cv-71-J-33MCR; 3:04-cv-78-J-33MCR; 3:04-cv-84-J-33JRK; 3:04-cv-94-J-33MCR; 3:04-cv-154-J-33MCR; 3:04-cv-138-J-33MCR; 3:04-cv-79-J-33MCR; 3:04-cv-103-J-33MCR; 3:04-cv-153-J-33MCR; and 3:04-cv-111-J-33MCR.

**DONE** and **ORDERED** in Chambers in Jacksonville, Florida, this 4th day of December, 2007.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

Copies: All Counsel of Record